IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al.,                ) <br>                                  ) <br>       Plaintiffs,         ) <br>                                  ) <br>        v.              ) <br>                                  ) <br> TRI-STATE MASONRY SYSTEMS, INC.,  ) <br>                                  ) <br>       Defendant.      ) <br>                                  ) | Civil Action No. 06-1949 (TFH) |

## MOTION FOR ENTRY OF DEFAULT JUDGMENT
## AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF

Plaintiffs, by their attorneys, and in accordance with Federal Rule of Civil Procedure 55(b)(2), move this Court to enter a default judgment in favor of the Plaintiffs and against Defendant in the amount of $158,289.20 on the ground that default has been entered against Defendant for failure to answer the Complaint of Plaintiffs. This motion is supported by the Declarations of David F. Stupar, attached hereto as Exhibit A, and Ira R. Mitzner, attached hereto as Exhibit B. The certificate of the Clerk of this Court declaring Defendant in default is attached hereto as Exhibit C. A copy of the Complaint filed by Plaintiffs is attached hereto as Exhibit D.

## FACTS

Plaintiffs, John Flynn, et al., filed the Complaint in this case on November 14, 2006. On December 4, 2006, Defendant Tri-State Masonry Systems, Inc. ("Tri-State Masonry") was served with the Summons and Complaint. Defendant has failed to file an Answer to the Complaint. On January 4 2007, the Clerk of this Court declared Defendant Tri-State Masonry in default.

## ARGUMENT

Rule 55 of the Federal Rules of Civil Procedure provides that when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, the clerk shall enter the party's default and "the party entitled to a judgment by default shall apply to the court therefor." Defendant has failed to answer the Complaint, default has been entered by the Clerk, and Plaintiffs are entitled to judgment. Accordingly, Plaintiffs' motion for a default judgment should be granted. *See, e.g.*, *Trustees of the Local 306, United Ass'n. Health & Welfare Fund v. Am. Testing & Inspection, Inc.*, No-88-2274-OG, 1988 WL 134942, *1 (D. D.C. Nov. 30, 1988) (entering default judgment where "defendant has failed to respond at any step of these proceedings or otherwise enter an appearance"); *Sanderford v. Prudential Ins. Co. of Am.*, 902 F.2d 897, 901 (11th Cir. 1990) (affirming entry of default judgment as "[n]either the text of the Federal Rules, nor judicial interpretation placed in the rules by the Federal Courts contemplate that a party may totally ignore pleadings and notices it receives").

DSMDB-2225328v01

## CONCLUSION

For the foregoing reasons, a default judgment in favor of Plaintiffs and against Defendant in the amount of $158,289.20 should be entered.

Date: March 14, 2007                Respectfully submitted,

By _____
Ira R. Mitzner (D.C. Bar No. 184564)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC  20006
(202) 420-2234

Counsel for Plaintiffs

DSMDB-2225328v01

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civil Action No. 06-1949 (TFH) |
| | ) |
| TRI-STATE MASONRY SYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF DAVID F. STUPAR IN SUPPORT
## OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, DAVID F. STUPAR, hereby declare as follows:

1.      I am the Executive Director of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund") and am also an authorized representative to effect collections on behalf of the International Masonry Institute ("IMI"), and the Bricklayers and Allied Craftworkers International Union ("BAC") as specified in the General Collection Procedures of the Central Collection Unit ("CCU") of the Bricklayers and Allied Craftworkers ("Collection Procedures" or "Procedures") (attached at Tab 1).  I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2.      The IPF is a multiemployer employee benefit plan subject to ERISA.  The IPF is governed by an equal number of employer-appointed and union-appointed Trustees, pursuant to the Taft-Hartley Act.  Benefits under the plan are funded by contributions from participating employers.

3.    The Fund provides pension and other benefits to employees who work in the construction industry under contracts negotiated between Bricklayer local unions and employers. Pursuant to these contracts, the employers are obligated to make contributions to the Fund in order to fund the benefits provided to the beneficiaries. The Trustees of the Fund have a fiduciary duty under ERISA to collect delinquent employer contributions, and the Trustees can be held personally liable for their failure to do so. 29 U.S.C. §§ 1104, 1109, 1132(g)(2). The Fund is administered in the District of Columbia.

4.    The Trustees adopted the CCU Collection Procedures governing the collection of employer contributions and reports.

5.    Under these Procedures, contributions and reports are due on or before the 15th day of the month ("Due Date") following the month in which work is performed. Once contributions are delinquent, the Procedures authorize the assessment of interest at 15 percent per annum and an additional amount, the greater of 15 percent per annum or 20 percent of the delinquent contributions, in the form of an additional computation of interest or liquidated damages.

6.    I am personally familiar with the account of Tri-State Masonry Systems, Inc. ("Tri-State Masonry" or Defendant").

7.    Tri-State Masonry, acting through its authorized agent or officer, signed a collective bargaining agreement ("Agreement") with the International Union of Bricklayers and Allied Craftsmen Local Union Nos. 4 and 5 New Jersey and 2 Delaware ("Locals 4 & 5 NJ and 2 DE"), which obligated Tri-State Masonry to submit monthly reports and payments to the IPF, IMI and BAC on behalf of its covered employees pursuant to the foregoing Procedures.

2

8.    Tri-State Masonry has performed work in the jurisdiction of Locals 4 & 5 NJ and 2 DE which is covered by the Agreement.

9.    An examination ("audit") of the books and records of Tri-State Masonry performed by the independent accounting firm of Ennis Prezioso & Company, LLC, revealed that Defendant failed to pay contributions to the IPF for work covered by the Agreement performed in various BAC Locals during the months of January 2003 through June 2004.

10.    As determined by the audit and as provided for in ERISA Section 502(g)(2)(A), Tri-State Masonry owes the IPF $37,840.77 in contributions due for work performed pursuant to the Agreement during the months of January 2003 through June 2004. As further provided for in ERISA Section 502(g)(2)(B) and under the terms of the Collection Procedures, interest on such delinquent contributions in the amount of $12,985.88, calculated at a rate of 15 percent per annum from the Due Date, is owed by Defendant. Moreover, pursuant to ERISA Section 502(g)(2)(C)(i) and the Collection Procedures, an additional computation of interest in the amount of $12,985.88, calculated at the rate of 15 percent per annum has been assessed on such delinquent contributions due the IPF.

11.    As determined by the audit and as provided for in ERISA Section 502(g)(2)(A), Tri-State Masonry owes the IMI $24,085.72 in contributions due for work performed pursuant to the Agreement during the months of January 2003 through June 2004. As further provided for in ERISA Section 502(g)(2)(B) and under the terms of the Collection Procedures, interest on such delinquent contributions in the amount of $8,505.62, calculated at a rate of 15 percent per annum from the Due Date, is owed by Defendant. Moreover, pursuant to ERISA Section 502(g)(2)(C)(i) and the Collection Procedures, an additional computation of

3

2225225.01

interest in the amount of $8,505.62, calculated at the rate of 15 percent per annum has been assessed on such delinquent contributions due the IMI.

12.     As determined by the audit and as provided in the Collection Procedures, Defendant owes the BAC $12,989.54 in delinquent dues checkoff for work performed during the months of January 2003 through June 2004.   As further provided for under the terms of the Collection Procedures, interest in the amount of $4,494.92, calculated at a rate of 15 percent per annum from the Due Date, is owed by Defendant.

13.     As of the date of this Declaration, despite due demand thereof, Defendant has failed to pay the contributions and dues checkoff owed to the IPF, IMI and BAC for work performed pursuant to the Agreement during the months specified above.

14.     Thus, as provided for in ERISA Section 502(g)(2)(A) and the Collection Procedures, Defendant owes $61,926.49 in delinquent contributions to the IPF and IMI in connection with work performed during the months of January 2003 through June 2004.

15.     As provided for in ERISA Section 502(g)(2)(B) and the Collection Procedures, Defendant is obligated to pay the IPF and IMI interest in the amount of $21,491.50 on such delinquent contributions, calculated from the Due Date at the rate of 15 percent per annum.

16.     As additionally provided for in ERISA Section 502(g)(2)(C) and the Collection Procedures, Defendant is obligated to pay the IPF and IMI $21,491.50, in an additional computation of interest calculated at the rate of 15 percent per annum from the Due Date on such delinquent contributions.

2225225.01

17.    As provided for in the Collection Procedures, Defendant owes a total of $12,989.54 in delinquent dues checkoff and estimated delinquent dues checkoff to the BAC as outlined above for work performed during the months of January 2003 through June 2004.

18.    As provided for in the Collection Procedures, Defendant is further obligated to pay a total of $4,494.92 in interest on such delinquent BAC dues checkoff, calculated from the Due Date at the rate of 15 percent per annum.

19.    The audit fee in the amount of $32,828.40 is recoverable under ERISA Section 502(g)(2)(D), and the terms of the Collection Procedures.  Based on the audit report provided to the Fund by the auditor, this was a complicated and time-consuming audit, involving hundreds of employees, and work performed in three different states, 9 local union jurisdictions, and 15 different divisions by craft.

20.    The court fee of $350.00 for filing this action is recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures.

21.    The process server's cost of $211.85 for serving the summons and Complaint is recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures.

22.    Attorney's fees of $2,505.00, which are recoverable under ERISA Section 502(g)(2)(D) and the terms of the Collection Procedures, have been incurred by the Plaintiffs in their attempt to collect delinquent contributions, dues checkoff, interest and liquidated damages due from Defendant.  An accounting of the attorney's fees incurred in this action is presented in the Declaration of counsel to the IPF, which accompanies this Motion for Default Judgment.

23.    The total amount owed the IPF, IMI and BAC by Defendant in delinquent contributions and dues checkoff for the months of January 2003 through June 2004 as set forth

2225225.01

above, interest on such delinquent contributions and dues checkoff owed the IPF, IMI and BAC (calculated at the rate of 15 percent per annum), an additional computation of interest (calculated at the rate of 15 percent per annum) on such delinquent contributions owed the IPF and IMI, audit fee, Court filing fee, process server's fee and attorney's fees is $158,289.20.

24.    Accordingly, Defendant owes Plaintiffs a balance of $158,289.20 as outlined above.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March __13__, 2007

David F. Stupar
Executive Director

6

2225225.01

**TAB 1**

5/13/02

### GENERAL COLLECTION PROCEDURES OF
### THE CENTRAL COLLECTION UNIT OF
### <u>THE BRICKLAYERS AND ALLIED CRAFTWORKERS</u>

These General Collection Procedures govern the collection of delinquencies by the Central Collection Unit of the Bricklayers and Allied Craftworkers ("CCU") on behalf of the following participating entities: Bricklayers and Allied Craftworkers International Union ("BAC"); Bricklayers and Trowel Trades International Pension Fund ("IPF"); Bricklayers and Allied Craftworkers International Health Fund ("IHF"); International Masonry Institute ("IMI"); Bricklayers and Allied Craftworkers Political Action Committee ("BACPAC"); and Local Officers and Employees Pension Fund ("LOEPF") (collectively "CCU Entities"). IHF and BAC SAVE are covered by Special Collection Procedures. Such Special Collection Procedures shall control when in conflict with these General Procedures.

I.     REPORTS AND PAYMENTS TO CCU ENTITIES

    A.    Due Date

        1.    Contributions and reports to the CCU Entities are due on or before the 15th day of the month following the month for which the contributions are being paid ("Due Date"), unless the collective bargaining agreement imposes a different Due Date.

        2.    Reports of participating employers must be filed each month even if no contributions are due for that month. All participating employers, whether submitting contributions directly or through a local administrator or local union, must use the standard CCU report form.

        3.    Employer reports will be date-stamped on the day received in the CCU Office, or in the case of local administrators or local unions, on the day received by the local. The stamped date will be the controlling date with regard to these Collection Procedures.

        4.    If any controlling date under these Collection Procedures falls on a weekend or legal holiday, the applicable date will be the next working day.

5. The IPF is authorized by other CCU Entities to act on their behalf in litigation. All references to "CCU Office" in these Collection Procedures may also refer to "IPF Office," as applicable.

B. Notice Of Delinquency

1. If the CCU Office has not received payment by the last day of the month of the Due Date, the CCU Office will send a Reminder Notice to the employer. If payment has not been received 30 days after the Reminder Notice, a Notice of Delinquency will be sent to the employer.

2. The Notice of Delinquency will advise the employer that required contributions were not received by the Due Date and warn that if the contributions are not received within 15 days (60 days following the Due Date), the employer will be considered delinquent ("Delinquent Date") and will be assessed interest at 15% per annum (retroactive to the Due Date) and may be required to pay Liquidated Damages of 20% of the delinquent amount. The Notice of Delinquency will require the employer to notify the CCU Office within five (5) days of the date of notice if the employer believes that the Notice of Delinquency was sent in error.

C. Notice Of Referral To Counsel

1. If the CCU Office has not received payment within 15 days of the Notice of Delinquency, the CCU Office will send to the employer a Notice of Referral to Counsel.

2. The Notice of Referral to Counsel will advise the employer that payments were not received by the Delinquent Date and that payments for contributions and interest are due and owing. Unless all sums owed are received by the CCU Office within 10 days following the Notice of Referral to Counsel, liquidated damages up to 20% of the delinquent contributions or statutory interest may be imposed and the matter automatically will be referred to counsel. The Notice of Referral to Counsel also will state that counsel will be instructed to seek all sums recoverable, including contributions, interest, liquidated damages or statutory interest, and all attorneys' fees.

2

II.    COUNSEL

    A.    Procedures

        1.    If CCU has not received the contributions and applicable interest within 10 days of the Notice of Referral to Counsel, the matter automatically will be referred to counsel no later than 15 days from the due date.

        2.    Within 10 days of referral, counsel will send a letter to the employer advising that if payment of contributions, interest and other damages is not received within 10 days, suit will be instituted.

        3.    Suit thereafter will be instituted.

    B.    CCU Policy Following Referral To Counsel

        1.    Following the referral of a matter to counsel, the CCU Office will have no authority to deal with an employer except to discuss computations.

        2.    Counsel shall file suit for all moneys recoverable, including damages that may be recoverable under Section 502(g)(2) of ERISA and also may seek remedies under applicable state law against individual corporate officers and/or shareholders.

        3.    The CCU is authorized to seek legal redress prior to the time that the above procedures are exhausted if, in his sole discretion, the Director concludes that the interests of affected participants require immediate action. If an employer fails to make payment when due, suit may be filed to collect all delinquent contributions, interest and other damages regardless of other exhaustion requirements in these Collection Procedures.

III.    AUDITS

    Audits will be conducted to insure full compliance with employer obligations under collective bargaining agreements. Every employer can expect to be audited at some time. If a delinquency is discovered as the result of an audit, the employer will be assessed the cost of the audit.

A.    Detection Of Delinquent Employers Subject To Audit

    1.    At least once every year, the Executive Directors of the IPF and IHF will send information to participants reflecting contributions received from participating employers. The participants will be encouraged to report missing hours to the CCU.

    2.    The CCU will take steps to insure that delinquencies of participating employers are recovered.

B.    Audits Performed By Third Parties

    1.    The CCU will rely upon audits performed by third parties when CCU determines that they conform to auditing procedures contained in the CCU's Guidelines.

    2.    The CCU periodically will monitor the audits of third parties in order to confirm their reliability.

C.    Audits Performed On Employers Contributing Directly To The CCU

    1.    The CCU will coordinate with third parties who perform audits on employers contributing directly to CCU and will insure that such audits conform to CCU guidelines.

    2.    As to employers contributing directly to the CCU who are not subject to audits by third parties, CCU will perform two types of payroll audits on directly contributing employers in order to insure compliance.

        a.    Random Audits -- Audits may be conducted on any participating employer at any time, on a random basis, at the direction of the Director.

        b.    Problem Audits -- When the Director receives information from a local union, covered member or other source indicating that an employer may be delinquent, the Director may order that an audit be conducted.

D.    Notification Of Audit Delinquency

    1.    The CCU Office will send a Notice of Delinquency to audited employers found to be delinquent stating the amount of additional contributions owing as a result of the audit.

    2.    Any unsatisfied audit deficiency will be treated according to the CCU's Collection Procedures following the intervention of counsel.

4

E.    Form of Audits

    1.    All audits will be carried out under procedures formulated by the Director.

    2.    All employer books and records set forth in the audit procedures will be made available to the CCU auditor.

IV.    BONDS

The Director may, in his sole discretion, require an employer to post a cash or surety bond in an amount and under terms necessary to protect the interests of the applicable CCU Entity.

5

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 06-1949 (TFH) |
| | ) |
| TRI-STATE MASONRY SYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF IRA R. MITZNER
## IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, IRA R. MITZNER, hereby declare as follows:

1. I am a partner with the firm of Dickstein Shapiro LLP and the counsel of record for the Plaintiffs John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H.J. Bramlett, Eugene George, Paul Songer, Charles Verlado, Matthew Aquiline, Gregory Hess, Michael Schmerbeck, Vincent Delazzero, and Ben Capp, Jr., ("IPF"), in the above-captioned case. I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2. On December 4, 2006, a copy of the Summons and Complaint were served upon Lois E. Callice, as agent of Tri-State Masonry Systems, Inc.

3. As of this date, no Answer to the Complaint is reflected on the docket.

4. As set forth in the accompanying Declaration of David F. Stupar, Defendant owes the following sums to Plaintiffs:

| | | |
|---|---|---|
| $ | 61,926.49 | Delinquent contributions due the IPF and IMI for work performed during the months of January 2003 through June 2004, pursuant to the Agreement signed with BAC Locals Union Nos. 4 and 5 New Jersey and 2 Delaware, as determined by the audit |
| $ | 21,491.50 | Interest assessed on the above delinquent contributions due the IPF and IMI, calculated at the rate of 15 percent per annum from the Due Date |
| $ | 21,491.50 | An additional computation of interest (calculated at the rate of 15 percent per annum) assessed on the above delinquent contributions due the IPF and IMI |
| $ | 12,989.54 | Dues checkoff due the BAC for work performed during the months of January 2003 through June 2004, pursuant to the Agreement signed with BAC Local Union Nos. 4 and 5 New Jersey and 2 Delaware, as determined by the audit |
| $ | 4,494.92 | Interest on such dues checkoff due the BAC |
| $ | 350.00 | Filing fee (for U.S. District Court) |
| $ | 211.85 | Process Server's costs |
| $ | 32,828.40 | Audit costs |
| $ | 155,784.20 | Subtotal |

5.  Additionally, the Employee Retirement Income Security Act of 1974 ("ERISA") provides for the mandatory award of attorney's fees.  ERISA Section 502(g)(2)(D).  Plaintiffs' counsel has charged the Fund less than the firm's market rate in this matter for well-intentioned, public-spirited reasons.  Counsel for Plaintiffs has offered this reduced fee in order to mitigate financial hardships to the Fund, which provides retirement benefits to members of the International Union of Bricklayer and Allied Craftworkers.  We believe that our efforts help to ensure the viability of the Fund and, in turn, the welfare of those participants and beneficiaries who depend on their pensions for income after retirement.

6.  Counsel for the Funds, consistent with the decision of the United States Court of Appeals for the District of Columbia Circuit in *Board of Trustees of the Hotel and Restaurant*

2

*Employees Local 25 and Employers' Health and Welfare Fund v. JPR, Inc.*, 136 F.3d 794, 800-808 (D.C. Cir. 1998), on remand, 1999 WL 1567733 (D.D.C Sept. 10, 1999), and for the reasons set forth in paragraph 5 above, therefore seeks to recover counsel's market rates in this action rather than the reduced fee charged to the Fund.

7. The fees incurred to date by Dickstein Shapiro LLP in this action have been calculated according to the normal billing rates in effect currently or at the time services were performed for the Fund, and are as follows:

|  | Hours | Per Hour | Total |
|---|---|---|---|
| Ira R. Mitzner | 0.30 | $510.00 | $ 153.00 |
| (Partner) | 0.70 | $535.00 | $ 374.50 |
| Claudette Elmes | 3.50 | $165.00 | $ 577.50 |
| (Paralegal) | 7.00 | $200.00 | $1,400.00 |
| **Total** | **13.80** |  | **$2,505.00** |

8. The default of Defendant for failure to answer was entered by the Clerk of this Court on January 4, 2007.

9. The total known balance due Plaintiffs by Defendant as of this date is $158,289.20.

10. We therefore pray for entry of default in favor of Plaintiffs in the amount $158,289.20.

I declare under penalty of perjury that the foregoing is true and correct.

Date:    March _H_ , 2007

Ira R. Mitzner

3

2225288.01

**EXHIBITC**

Default - Rule 55A (CO 40 Revised-DC 02/00)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et al

_____

Plaintiff(s)

Civil Action No.  06-cv-01949-TFH ___

v.

TRI-STATE MASONRY SYSTEMS, INC.

_____

Defendant(s)

TRI-STATE MASONRY SYSTEMS, INC.

RE:

### DEFAULT

It appearing that the above-named defendant(s) failed to plead or otherwise defend this action though duly served  with summons and copy of the complaint      on       December4, 2006      , and an affidavit on behalf of the plaintiff having been filed, it is this  4th  day of ___ January ___, 2007 declared that  defendant(s) is/are in default.

NANCY MAYER-WHITTINGTON, Clerk

By: _____
                L. Chipley
Deputy Clerk

**Exhibit D**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, JAMES BOLAND, GERALD )
O'MALLEY, KEN LAMBERT, GERARD SCARANO, H. )
J. BRAMLETT, EUGENE GEORGE, PAUL SONGER, )
CHARLES VELARDO, MATTHEW AQUILINE, )
GREGORY R. HESS, MICHAEL SCHMERBECK, )
VINCENT DELAZZERO, and BEN CAPP, JR., as Trustees )
of, and on behalf of, the BRICKLAYERS & TROWEL )
TRADES INTERNATIONAL PENSION FUND, )
  1776 Eye Street, NW, Fifth Floor )
  Washington, DC  20006 )
  (202) 783-3788, )
    )
INTERNATIONAL MASONRY INSTITUTE )
  1776 Eye Street, NW, Fifth Floor )
  Washington, DC  20006 )
  (202) 783-3788, )
    )
     and )
    )
INTERNATIONAL UNION OF BRICKLAYERS AND )
ALLIED CRAFTWORKERS )
  1776 Eye Street, NW, Fifth Floor )
  Washington, DC  20006 )
  (202) 783-3788, )
    )
    )
     Plaintiffs, )
    )
     v. )  Civil Action No. 06CV1949
    )
    )  JUDGE: Richard W. Roberts
TRI-STATE MASONRY SYSTEMS, INC., )
  521B Plymouth Road )  DECK TYPE: Labor/ERISA (non-
  Plymouth Meeting, PA  19462, )          employment)
    )
     Defendant. )  DATE STAMP: 11/14/2006
    )

## **COMPLAINT**

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the

Defendant, allege as follows:

2163726.01

## CAUSE OF ACTION
### Jurisdiction and Venue

1.  This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund"), to enforce the terms of the Plan and Trust Agreements adopted by the IPF and the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Labor Management Relations Act ("LMRA"). This action arises under the laws of the United States, specifically Section 502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145, and Section 301 of the LMRA, 29 U.S.C. § 185. Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court as to the claims brought on behalf of the IPF, the Bricklayers & Trowel Trades International Health Fund ("IHF"), and the International Masonry Institute ("IMI"). As to the claims brought on behalf of the International Union of Bricklayers and Allied Craftworkers ("BAC"), jurisdiction is conferred under Section 301(c) of the LMRA, 29 U.S.C. § 185(c).

2.  The IPF, IHF, and IMI are administered in the District of Columbia. Venue for the claims asserted by the IPF, IHF, and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

BAC maintains its principle office in the District of Columbia. Venue for the claims asserted by the BAC is therefore conferred on this Court pursuant to Section 301(c)(1) of the LMRA, 29 U.S.C. § 185(c)(1).

2

## **Parties**

3.      Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, Charles Velardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Ben Capp, Jr., are Trustees of, and sue on behalf of, the IPF.  The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).  Plaintiffs bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4.      The IPF is also authorized to effect collections on behalf of the IMI and BAC, pursuant to a written Assignment of Claims and the *Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers* ("Collection Procedures").

5.      Plaintiff, IMI, is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

6.      Plaintiff, BAC, an unincorporated association, is a labor organization within the meaning of 29 U.S.C. § 152(5) and is entitled to bring suit under 29 U.S.C. § 185.

7.      Defendant, Tri-State Masonry Systems, Inc., is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of Pennsylvania.

8.      Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

3

## Violation Charged

9.     Tri-State Masonry systems, Inc., acting through its authorized agent or officer, executed a collective bargaining agreement with the Union.  That collective bargaining agreement is annexed hereto as Exhibit A and is hereinafter referred to as the "Agreement".

10.     Pursuant to the Agreement, Defendant agreed to make certain payments to the IPF, IMI, and BAC on behalf of covered employees of Defendant.

11.     Having submitted some contributions, Defendant has demonstrated an awareness of the obligation to make those payments.

12.     An examination of Defendant's books and records ("audit") performed by the independent accounting firm of Ennis Prezioso & Company, LLC, covering the time period January 2003 through June 2004 revealed that Defendant failed to properly submit required reports and contributions for work performed during this time period.

13.     The total of contributions due the IPF and IMI by Defendant for work performed during the months of January 2003 through June 2004, as determined by the audit, amounts to $61,926.49.

14.     Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $21,491.50 and an additional computation of interest in the amount of $21,491.50, calculated from the Due Date at the rate of 15 percent per annum have been assessed on such delinquent contributions determined due by the audit.

15.     Defendant also owes the BAC delinquent dues checkoff moneys in the amount of $12,989.54 for work performed during January 2003 through June 2004 as determined by the audit.

4

2163726.01

16.    In addition, Defendant owes the BAC $4,494.92 in interest on delinquent dues checkoff determined due by the audit.

17.    Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).  Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to make contributions in accordance with the terms and conditions of the Agreement.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.   For the total amount of $155,572.35, which is constituted as follows:

a.   For unpaid contributions in the amount of $61,926.49 payable to the IPF and IMI for the time period January 2003 through June 2004 (ERISA  Section 502(g)(2)(A); Collection Procedures);

b.   For interest in the amount of $21,491.50 assessed on such unpaid contributions, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

c.   For an additional computation of interest in the amount of $21,491.50, assessed on such unpaid contributions, calculated at the rate of 15 percent per annun from the Due Date (ERISA Section 502(g)(2)(C)(i); Collection Procedures);

d.   For dues checkoff moneys owed to the BAC in the amount of $12,989.54 (29 U.S.C. § 185; Collection Procedures);

e.   For interest in the amount of $4,494.92 on such delinquent dues checkoff moneys (29 U.S.C. § 185; Collection Procedures);

f.   For the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D));

g.  For the costs of conducting the audit in the amount of $32,828.40 (ERISA Section 502(g)(2)(D));

2.  In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

3.  That Defendant be directed to comply with its obligations to correctly report and to contribute to the IPF IMI, and BAC all additional reports and contributions due and owing, and to pay the costs and disbursements of this action.

4.  Such other relief as this Court deems appropriate, including judgment for any contributions and/or interest thereon that may accrue subsequent to the filing of this complaint, as well as any resulting statutory damages thereon under ERISA.

Dated: November _13_, 2006

By:_____
Ira R. Mitzner, DC Bar No. 184564
DICKSTEIN SHAPIRO  LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200

Attorneys for Plaintiffs

6

**EXHIBIT D**

DNJ 0297

# AGREEMENT BETWEEN

## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY

## OTHER SIGNATORY EMPLOYERS

-and-

## LOCAL UNION NOS. 4, 5 & 2
## OF THE
## INTERNATIONAL UNION OF
## BRICKLAYERS AND ALLIED CRAFTWORKERS

*November 1, 2002 through October 31, 2007*



RECEIVED
NOV 2 6 2002
COLLECTIVE BARGAINING SERVICES

# Table of Contents

DNJ 0297

|  | ARTICLE NO. | PAGE NO. |
|---|---|---|
| Apprentices | VII | 14 |
| Duration/Termination/Amendment | II | 1 |
| Foremen | VIII | 15 |
| General Understanding | XXI | 32 |
| Grievance Procedure | XV | 28 |
| Hiring Preference | V | 13 |
| Hours Work, Overtime, Shifts, Holidays | XII | 21 |
| Jointly Trusteed Funds | XI | 16 |
| More Favorable Conditions | XX | 32 |
| No-Strike/No-Lockout | XVIII | 31 |
| Parties | I | 1 |
| Payment of Wages & Fringe Benefits | XIII | 23 |
| Preservation of Work | XVII | 30 |
| Scope of Work | III | 1 |
| Separability and Savings Provision | XIX | 31 |
| Stewards | VI | 13 |
| Subcontracting | XVI | 30 |
| Traveling Contractors | IX | 15 |
| Union Recognition, Union Security Access | IV | 12 |
| Wages, BACPAC, and Local Dues Checkoff | X | 16 |
| Working Conditions | XIV | 24 |

D NJ 0297

# AGREEMENT BETWEEN
# BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY
# OTHER SIGNATORY EMPLOYERS
### -and-
# LOCAL UNION NOS. 4, 5 & 2
# OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED
# CRAFTWORKERS

## ARTICLE I
## PARTIES

This Agreement is entered into this *first day of November 2002,* by and between the Building Contractors Association of New Jersey, (hereinafter referred to as the Association), for and on behalf of its members as set forth in Schedule "A" attached hereto and other contractors who are signatory hereto or who may become signatory hereto (hereinafter referred to as the Employer), and the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL UNION NOS. 4, 5 & 2 (hereinafter referred to as the Union).

The Association agrees to furnish to the Union a list of all members of the Association denoting those members bound to the terms of this Agreement, the honorary members, independent members, and any other classes or groups of members.

## ARTICLE II
## DURATION - TERMINATION - AMENDMENT

This Agreement shall be effective commencing *November 1st, 2002* and shall continue in full force and effect up to and including *October 31, 2007,* and shall be automatically continued for each successive period of this Collective Bargaining Agreement unless written notice of decision to negotiate a new Agreement in whole or in part, is given in writing by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

## ARTICLE III
## SCOPE OF WORK

A.   This Agreement shall cover new construction, maintenance, repair and renovation in the State of New Jersey.

NJ 0297

B.   The Employers bound hereby recognize the Union's claim to all  work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

C.   The installation of Brick and all other masonry units such as blocks, etc., with or without mortar, anywhere on the project shall be the work of Bricklayers & Allied Craftworkers of International Union, Local Nos. 4 & 5.

D.   Temporary heat, applicable to all branches of the trade, to protect any Masonry work performed and shall include all masonry materials all year, especially in the winter months (November 15th through March 15th).

E.   The trade and territorial jurisdiction for Local No. 4 shall cover new construction, maintenance, repair and renovation for the following trades and counties:
Bricklayers, Cement Masons, Plasterers, Pointer Caulkers, Cleaners, Fire Proofers, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for Bergen, Essex, Hudson, Morris, Passaic, Sussex, Union, Warren, part of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

F.   The trade and territorial jurisdiction for Local No. 5 shall cover new construction, maintenance, repair and renovation for the following trades and counties:
Bricklayers, Pointer Caulkers, Cleaners, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for, Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

G.   The trade and territorial jurisdiction for Local No. 2 shall cover new construction, maintenance, repair and renovation in the following trades and counties:
Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset for all work falling within the jurisdiction of the Union, as defined in Branches of the Trades for Cement Masons, Plasterers & Fire Proofers, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers.

## Brick Masonry

A.   Bricklaying masonry shall consist of, but not limited to, the following work procedures and installation of the following materials: The laying of bricks made from any material in, under

2

▷ NJ 0297

or upon any structure or form of work where bricks are used, whether in the ground, or over its surface, or beneath water, in commercial buildings, rolling mills, iron works, blasts or smelter furnaces, lime or brick kilms, in mines or fortifications and in all underground work, such as sewers, telegraphy, electric and telephone conduits; including the installation of substitutes for brick such as all carbon materials, Karbate, Impervite or mixtures, all acid resistant materials, all terra cotta and porcelain materials, except where the foregoing materials are manufactured to substitute for tile as provided for under the category of Section 8, C of the Codes of the International Union of Bricklayers and Allied Craftworkers. All cutting of joints, pointing, cleaning and cutting brick walls, fireproofing, block, arching terra cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork, blocks and glass masonry or any substitutes for the above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the installation of all brackets and fasteners is the work of the mason exclusively, the cutting and rubbing and grinding of all kinds of bricks and the setting of all cut-stone trimmings on brick buildings, is bricklayer's work. The preparation and erection of plastic castables or any refractory materials is bricklayer's work.

B.    Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing categories, all waterproofing and black mastic waterproofing, silicone and/or substitutes sandwiched between masonry units in the interior of the wall.

C.    All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation; all quarry tile over 9"x 9" x 1 1/4" in size, split brick or quarry tile or similar material if bedded and jointed with one operation. The bedding, jointing and pointing of the above materials shall be the work of the craft installing same.

D.    All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures; all clay products known as terra cotta tile, unit tile, ceramic veneer and machine-made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation. Where the preponderance of material to be installed is of the above size and when material of lesser sizes is to be used in connection therewith, the bricklayers shall install all such materials. Brick paving comes under bricklayers' trade classifications. The parties acknowledge the Union's claim to screeding of sub base regardless of type of material used.

E.    Grouting of all Masonry Units, all Leveling Plates for steel columns, all machinery and Precast Panels shall apply to all branches of the trade.

F.    The Bricklayer shall perform the complete installation and related finish work of all AACMU. These operations include, but are not limited to; the cutting, fitting and applications of mortar and/or other cementious materials used for the setting and bonding purposes as well as the actual laying of the AACMU block units into position. The routing,

3

NJ 0297

drilling, cutting and patching for all mechanical piping and openings. The preparation, assembly, unloading, selecting or staging of AACMU panels, hooking on, signaling, drilling, cutting, installation of support angles or strut supports, fitting, bedding, landing, setting, leveling, plumbing, aligning, fastening, anchoring (whether by bolt, clip, pin, or weld), insulation, caulking, grouting, patching, cleaning, waterproofing and installation of all AACMU units. This also includes all work operations related to the installation and applications of all coating, covering and veneer systems (both exterior and interior) on all AACMU units. These work operations include, but are not limited to: preparations of walls, the mixing and applications of any and all finish coating materials by any method (i.e. trowel on, machine, spray on, etc.) or any other device deemed necessary to produce the desired finish surface.

## Stone Masonry

A.    Stone Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying of all rip rap, rubble work with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of buildings by architects, and customarily called "stone" in the trade.) Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over 10 inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals and the cutting of a draft upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

B.    This is to apply to all work in buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, playgrounds, parks, landscaping and curbing or other public works and to all kinds of stone, particularly to the product of the locality where the work is being done. Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C.    Cleaning, grouting, pointing and other necessary work to achieve and complete the work under the foregoing categories.

## Artificial Masonry

A.    Artificial Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The cutting, setting and pointing of cement blocks and all artificial stone or marble, either interior or exterior, when set by the usual custom of the stone mason and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be handled by employees in the

4

NJ 0297

bargaining unit for which the highest rate of wages shall be demanded.

B.    All artificial masonry, the cutting, setting and pointing of all concrete prefabricated slabs, regardless of dimension size, shall be the work of members of this organization, for which the regular wage scale in the jurisdiction where the work is performed shall be paid.

C.    Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height, the dressing of all jams, corners and ringstones, joints, or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stonework.

D.    This is to apply to all work on buildings, sewers, bridges, railroads or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done and the same shall be considered stone masonry.

E.    Bricklayers and stone masons shall have the right to use all tools which they consider necessary in the performance of their work.

F.    All cement that is used for parging up external walls and block units,  installing reinforcing rods and door blocks, and all grouting.

G.    The building of party walls, columns, girders, beams, floors, stairs and arches.  Gypstell products and cement of precast slabs on roofs or wherever used in building construction of alterations, and all material substituted for the clay or natural stone products.  All wall ties and brackets used to anchor brick, block, stone or any type of masonry whether screwed or nailed is the work of the mason, as per the 1962 agreement between the B. & A.C. and Ironworkers herein incorporated by reference.

H.    The laying out and supervising of work for or by the use of any or all of the above materials shall be done by the employees covered hereunder.

### Cement Masons Agreement

A.    Cement masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights.

B.    The cutting of all cement and concrete for patching and finishing; the bush hammering of all concrete when cast in place; the operation of cement gun, the nozzle and the finishing of all material applied by the guns, and the operation of the cement floor finishing machines.  The cement mason shall have the right to use all tools necessary to complete his work.

C.    The operation of the Lazar Screed Machine shall be performed solely by the Cement Masons.

5

NJ 0297

D.   Concrete constructions, such as buildings, bridges, elevators, smokestacks, curbs, gutters, sidewalks, street paving, alleys and roofs; laying out, setting joists, strips or screed rods for work hereinafter specified; laying and finishing of cement, wearing surfaces of basements, floor yards, driveways, areas and other surfaces where cement finish is to be laid; and where strips have to be set, or material ruled down, or surfaces finished; screening of concrete or fine stuff, asphalt or other preparations that are to be troweled, floated, darbied or bull floated; troweling, floating or finishing of concrete or fire retarding material or waterproofing compound or mixtures; construction of glass vaults or sidewalks, lights, where same is set in cement; excepting the carpenter work, but including pointing, facing and finishing of the surfaces after forms are removed; leveling of all fine materials for facing same; running of all cement base; cutting; patching and finishing of concrete fireproofing on walls, beams, girders and columns; cutting facing and finishing with cement of all concrete surfaces such as arches, beams, girders, walls, pile caps, piers and columns, whether done with trowel, float, gun and nozzle, bushhammer, rubbing or other process; applying cement mortar for damp-proofing, waterproofing for sanitary purposes where not over four (4) feet high whenever cementing with the floor is done in one operation; cutting of all concrete when cement finish is applied; setting of carpet pins and sockets in cement and composition brass or other metallic or wood strips when inserted in floor during the laying of same; rodding and spreading of all concrete and spreading and finishing of all top material; setting of all strips and stakes and grade; pointing, caulking and patching around all steel or metal window frames that touch concrete; handling of the vibrator machine. Washing and treating of all cement surfaces, handling of all machines, trowel machines, riding trowel machines, apparatus or equipment of any kind in connection with or to perform any of the above functions shall be the work of the cement finisher. Any signatory contractor who subcontracts sidewalks and curbs shall, in good faith, inform the subcontractor that said work is within the jurisdiction of the    Bricklayers & Allied Craftworkers,    Local Unions No. 4 & 5.

E.   The pouring of all concrete shall require a mason.

F.   When concrete bucket is used in conjunction with a crane, all safety precautions shall be exercised.

G.   The aligning of all bolts and the setting of all plates shall be performed by the employees covered hereunder.

H.   When flat concrete arches are poured with a crane, a hopper must be used in conjunction with a concrete bucket.

I.   On all high rise buildings an exterior scaffold for the cement masons shall be erected complete with guard rails.

6

NJ 0297

J.    There shall be no cutting of cement masons crews before pull up is completed.

K.    Overtime shall only be with the prior permission of the union and shall be equitably shared by the employees working on the job.

L.    No cement worker working alone shall use a straight edge of more than six feet in length. Where a straight edge is longer than six feet, two men shall be used on a straight edge which is between six and eleven feet in length, one additional man shall be used for every additional four feet or fraction thereof of straight edge. On power straight edges or roller-type straight edges, two men shall be utilized up to fourteen feet and one additional man shall be used for each five feet or fraction thereof.

M.    The casting and pouring of pre-cast slabs when done on the job site shall be the work of a cement mason.

N.    Cement masons are to complete, joint and strike up their work, whether this work is done with cement or caulking compound on any other masonry material.

O.    The cement masons shall supervise the placing or pouring of all concrete. In the event there is a journeyman already working at the job site who is recognized by the Local Union as a competent cement mason, he may be assigned to such work, otherwise a cement mason shall be hired.

P.    When concrete floors are to be hand troweled, the Employer shall provide knee boards such as the type used by cement finishers to handle trowel concrete floors, such knee boards shall measure approximately 12" wide and 30" long or fraction thereof, and shall have handles.

Q.    The following work shall be allotted to the cement masons only: The setting of all screeds and forms to determine the proper grade of concrete when held in place by stakes and/or spreaders shall be done by cement finishers. A screed is a strip of wood, metal, etc., used as a guide for leveling or grading a concrete floor, slab or sidewalk.

R.    Any bulkhead that is one single board in height, and that has no key attached or which is not notched or fitted shall be set and braced or staked by cement finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

S.    The grinding, patching and curing of all floors, the snapping of wall ties, and patching of same and setting of expansion joints.

T.    Steps, Landings, Platforms, etc. The setting of forms for steps, landings, platforms, coping, caps and curbs, except where underforms or centers are required, and the placing of all fine materials for facing same, shall be done by cement masons.

NJ 0297

U.  Curing and dustproofing of all floors are to be done by cement masons. All epoxy, acid and latex work will be an additional $.50 per hour above scale.

V.  The cement mason shall have the right to use all tools necessary to complete his work. There shall be no restriction as to the use of machinery or tools.

W.  When troweling floors with machine, changing of blades, cleaning and maintaining machine to be done by mason.

X.  No concrete trucks, pumping machine or any other machines are to do any mixing inside any structure without proper ventilation.

Y.  Special Tools: The employer agrees to furnish the following tools for use by his employees: Respirators, goggles, boots, bull floats, brooms, brushes, power chisels, trowel machines, bushhammers, straight edges, rubber floats, rubbing stones, cover tools, special base tools and special edgers. Gloves furnished when using epoxies, acid, latex floor patching or any irritant.

Z.  All wages, waiting time and general working conditions that apply to bricklayers shall also apply to the cement mason.

## Plastering

A.  Level 5 Gypsum Board Finishing is the work of Plasterers.

Level 5 finishing as specified by the Association of the Wall and Ceiling Industries International (AWCI), Ceiling and Interior Systems Construction Association (CISCSA), Gypsum Association (GA), and Painting and Decorating Contractors of America (PDCA), in their "Levels of Gypsum Board Finish Recommended Specification."

Levels Description: All joints and interior angles shall have tape embedded in joint compound and three separate coats of joint compound applied over all joints, angles, fastener heads, and accessories. A thin skim board of joint compound, or a material manufactured especially for this purpose shall be applied to the entire surface. The surface shall be smooth and free of tool marks and ridges. Note: It is recommended that the prepared surface be coated with a primer/sealer prior to the application of finish paint. (See painting specification in this regard.)

The level of finish is recommended where gloss, semi-gloss, enamel or non-textured flat paints are specified or where severe lighting conditions occur.

This highest quality finish is the most effective method to provide a uniform surface and minimize the possibility of joint photographing and of fasteners showing through the final decoration.

8

~ NJ 0297

The work jurisdiction of the plasterer under level 5: Gypsum board finishing shall be that which has heretofore been performed under this Agreement and is further set forth in constitution of the International Bricklayers and Allied Craftworkers of the United States and Canada. The parties agree to be bound by decisions rendered by the "Green Book" Decision of Record rendered by the Hearings Panel (March 1, 1978) under the plan for the settlement of jurisdictional disputes in the construction industry.

B.   All cement plastering, stone texture, stucco work, and pebble dask work, either exterior or interior, shall be done by plastering employees under this contract.

C.   All plastering, including plastering alterations and repairs, and all cement, caehstone, acoustic or any plastic substitute or artificial or imitative composition for plain surfaces or for moldings, cornices, pilasters panels, capitals, columns, bases, keystones, brackets or centers when applied on any exterior or surface in the usual method of either plastering or stuck work shall be the work of plastering employees.

D.   All ornaments including centers, brackets, trusses and keystone shall be placed in position and pointed by plastering employees who are on the job. Cast ornamentation shall be made in a Union shop. No employee shall work on any operation where the stickling of ornamentation has been sublet.

E.   All moldings, covers, arrises, chamfers and bullnoses shall run in place wherever possible with a regular mould on proper running strips. When moldings or cornices are to be ornamented proper beds shall be run to secure same.

F.   All capitals and bases shall be run on the job if practical to do so.

G.   All templates to be used by the plasterer shall be placed in position by the plasterer.

H.   All plastering shall consist of not less than three coats as scratch, brown and finish. Before the brown coat is applied, the scratch shall be hard and set. The brown coat shall be made true with a straight edge rod in all upright and ceiling angles: the walls and ceilings shall be properly darbied and floated to an even surface and the angles cut out. The finish coat shall be properly gauged and troweled to the required surface and all angles featheredged true. All interior or exterior plastering shall be left straight and true with rod and darby; rod and darby to be furnished by the contractor. The taping and pointing of sheetrock, compo-board, plaster-board, etc., shall be the work of the plasterer.

I.   When Sprayo-Flake or similarly applied acoustics are used the applied acoustic will take the place of the finish coat and will be applied by plastering employees.

J.   The operation of all mechanical plastering or troweling machines, pertaining to plaster and all of its substitutes, shall be the work of the plasterer.

9

NJ 0297

K.  All safety precautions, goggles, shields, and masks, shall be supplied by the contractor for the health and welfare of the plastering employees operating these machines.

L.  Plastering on concrete, fireproofing, brickwork or plaster boards shall be two coat work-brown and finish.

M.  The finish coat may be omitted on cellar ceilings provided the brown coat is floated to an even surface. All EIF systems and all related work.

N.  Finishing of walls and ceilings shall not be done until the screeds, cornices or covers with which they intersect are in place.

O.  Employees shall not install metal corner beads, nor shall they work on any operation where corner beads have been used to form arrises on beams or arches or corners except door or window heads or other continuous openings not over twelve (12) feet in height.

P.  On a scaffold area of one hundred and fifty (150) square feet or over, the mortar board shall be raised 30" from the scaffold on a properly constructed stand. On a scaffold area of less than 150 square feet, the mortar board shall be raised at least 12" from the scaffold on a properly constructed stand. No mortar board shall be raised on blocking, and no mortar board or gauging board shall be more than 4'6" square.

Q.  Where beams are sixteen (16) inches or over in depth, the scaffold shall be dropped to a suitable height where the plasterers may execute their work in a proper manner.

R.  Any material applied on walls by the plasterers shall not be higher than 6'6" from the floor. Where only the walls have to be plastered, a scaffold 4 planks wide and 6' from the ceiling shall be erected on which the mortar board shall be placed and raised 12" above the scaffold. Positively no hopping planks to be permitted.

S.  There shall be a foreman plasterer on all plastering jobs. Plastering foremen shall meet the requirements for foremen as specified herein, and shall be paid as specified herein.

T.  Plastering foremen shall see that no gauging is made up later than thirty (30) minutes before 12 o'clock and thirty (30) minutes before quitting time.

U.  Plastering work, when sublet, shall be given to a subcontractor who employs employees covered under this contract.

V.  Plastering contractors shall furnish all the materials required for their work including all screed rods, cornice, rods, darbies and feather edges. No subcontractor shall contract for labor only.

N J    0 2 9 7

W.    Synthetic Plastering Systems: The styrofoam and any other materials which is part of the system that are installed by screws, glue, masonry materials, and including Mechanical System.

## Firebrick

The matters set forth in this section are applicable solely to firebrick work.

A.    On all firebrick jobs, when working with regular firebrick and lay, the bricklayers will be permitted an additional fifteen (15) minutes to wash up or twenty-five (25) minutes when working with a carbon, acid proofing, high temperature clay or any other material out of the ordinary such as colored cements, asphalts, tars, plastics, etc. Solvent for washing up and cleaning of tools will be provided for by the employer.

A bricklayer working with carbon or acid proofing materials shall be given a minimum of five (5) minutes wash-up prior to lunch time.

B.    All scaffolding inside of furnace shall be solid nailed scaffold. Contractors to furnish safety equipment and have same on job site.

Provisions for adequate scaffolding shall be made so that the lead man does not have to climb over the wall to work on the opposite side of the wall. Adequate scaffolding shall mean standard metal tubular scaffolding or wooden scaffolding consisting of a platform of not less than 2" x 10" planks in width, and scaffolding shall remain in place until all paving has been completed.

C.    Clay shall be mixed at the furthermost location of the enclosure where refractory brick is being laid. The location to be selected as to both its physical separation from the work area and to its feasibility for performing the mixing function. In coke oven work a separate enclosure is required. All care shall be exercised to reduce dust.

D.    When bricklayers are employed laying firebrick, the contractor shall pay for the sharpening of their tools required for the work, and all tools shall be sharpened to the satisfaction of the bricklayer. The contractor shall furnish all chisels over twelve (12) inches in length and all saws when required.

E.    On all jobs where conditions are such that a safety man is required by the owner, he shall be mutually agreed upon by the parties. For the safety of the bricklayers, said safety man must be a union bricklayer.

F.    All hot work shall be paid at the rate of double time. Fringe benefits shall be based on hours paid.

11

NJ 0297

One hundred degree (100) Fahrenheit or over shall constitute hot work. When bricklayers are employed on excessive hot work, the contractor shall provide proper counter fatigue aids which shall meet the standards prescribed by the State Medical Board, shall provide proper gloves and protective materials to safeguard bricklayers when they are handling hot work, shall supply wooden shoes or facsimile when working on heated surfaces and contractors shall be responsible for tools, shoes, and clothes of bricklayers which they burn in performance of their duties on said work. Bricklayers must spell each other on all hot work.

Contractor will also be responsible for clothes, tools and/or shoes that are destroyed or damaged on jobs due to exception conditions and materials.

G.    When electrical grinding stones or carborundums are used, bricklayers shall leave that part of the job until the operation is completed. In an enclosed area, suction device to be used to remove dust while bricklayers grind. The employer and union shall arrange to spell bricklayers at ten minute intervals when they are actually performing grinding work.

H.    On stoves and furnaces, or anywhere else where danger of gas exists, approved gas detecting devices will be required.

I.    On all firebrick or acid proofing jobs, the employer shall furnish all bricklayers with gloves.

J.    All general working conditions which apply to the bricklayer shall also apply to all branches of the trade.

K.    In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

L.    In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A.    The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article III of this Agreement, and in the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B.    No later than eight (8) days following the effective date of this Agreement, all present

NJ 0297

employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C.    International Union Representatives and the Business Manager and/or other officers of the Union shall have access to the Employer's jobsites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

D.    It is recognized and agreed by the parties to this Collective Bargaining Agreement that the Local Union is the authorized collective bargaining agent for all its members in connection with issues related to the wages, working conditions, and employee fringe benefit funds.

## ARTICLE V
## HIRING PREFERENCE

The employer agrees that when hiring any employee for any job in the territorial jurisdiction of the agreement he will employ a fair percentage in the territorial jurisdiction of Local No. 4, or Local No. 5 or Local No. 2 of New Jersey. The employer also agrees that when requesting manpower, they must call the Local Union Office by 4:30 p.m. of the previous day.

## ARTICLE VI
## STEWARDS

A.    The Employer shall hire a steward for each branch of the trade appointed by the business manager of the Union on all jobs. The steward shall be a working employee and shall, when appropriate, be granted reasonable time to conduct union business. The steward shall not be laid off without reasonable cause, without first consulting the business manager.

B.    It is the steward's duty to look after the interest of both parties, see that the number of men

13

NJ 0297

desired by the employer is promptly reported to the business agent, take up all grievances on the job, and try to have the same adjusted. In the event that he cannot, he must report that fact to the business agent. He shall conduct himself in a proper manner at all times when on the projects and shall not be discriminated against, discharged, or laid off for the performance of his duties as such. The steward's employment can only be terminated by the employer after a review of complaint against him between the employer and the business agent.

C.    The first Bricklayers & Allied Craftworkers member shall notify the union at the start of each job.

## ARTICLE VII
## APPRENTICES

A.    In order to train sufficient skilled mechanics for the industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available. The employer agrees to employ one apprentice for every five journeymen employed on a job site. It is agreed that the Employer shall abide by the National Apprenticeship Standards, developed for masonry craft training, incorporated herein by reference.

B.    All apprentices will be required to attend and successfully complete a pre-job school which shall take place over a period of approximately 12 weeks at a place and at such times as designated by the State Joint Apprenticeship Committee.

C.    After 12 weeks of pre-job training, apprentices shall be required to serve a probationary period of 30 days of employment at the trade during which period no fringe benefit contributions will be required. After satisfactory completion of this period, credit will be given for this time served as part of the three year apprenticeship term. During the probationary period, the termination or cancellation of the apprenticeship agreement may be made by the committee at the request of either party to the agreement. After probationary period, the agreement may be canceled at the request of the apprentice or committee. The committee may cancel the agreement for good cause such as unexcused absences from the job and related training classes if required, lack of progress or interest, and unsafe practices common to the trade. Due notice shall be given to the apprentice with a reasonable opportunity for corrective action. Written notice shall be given to the apprentice and Bureau of Apprenticeship and Training of the final action taken.

D.    Apprentices shall be paid not less than the following percentages of the journeyman's basic wage rate.

First six months or 500 hours:     50% of Journeyman's Basic Wage Rate
Second six months or 500 hours:    55% of Journeyman's Basic Wage Rate

14

NJ  0297

| | |
|---|---|
| Third six months or 500 hours: | 65% of Journeyman's Basic Wage Rate |
| Fourth six months or 500 hours: | 75% of Journeyman's Basic Wage Rate |
| Fifth six months or 500 hours: | 85% of Journeyman's Basic Wage Rate |
| Sixth six months or 500 hours: | 95% of Journeyman's Basic Wage Rate |

During the first year of apprenticeship, after the probationary period, fringe benefit contributions shall be required for the Welfare Fund at 50%. No other fringe benefit contributions shall be required for this period. Deductions for check off dues and BAC PAC should be made according to Schedule "B" attached hereto. Commencing with the second year of apprenticeship (third six-months), fringe benefit contributions and check off deductions shall be made according to Schedule "B" attached hereto.

E.    Apprentices may be required to attend related training classes during period of apprenticeship as directed by the Joint Apprenticeship.

## ARTICLE VIII
## FOREMEN

There shall be a separate foreman on all jobs for each branch of the trade. The employer will determine when the foreman shall not work with tools. Foremen shall be paid the prevailing regular weekly pay (40 hours), between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided, however, that all foremen must report to work everyday within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

## ARTICLE IX
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article III of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article X of this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article III of this Agreement, the full terms and conditions of this Agreement shall apply.

15

~ N J 0297

## ARTICLE X
## WAGES, BACPAC, AND LOCAL DUES CHECKOFF

A.  The hourly wage rates for all employees performing work covered under this Agreement shall be as listed on Schedule "B" attached hereto.

B.  The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning November 1, 2002 and all subsequent increases thereafter, among the various benefit funds specified in Article XI.

C.  The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid. If the employee does not sign a dues check off authorization card, he shall report to the union hall to pay the weekly dues.

D.  The Employer agrees to deduct an amount from the pay of each employee, who is a union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions to the Treasurer of BACPAC, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

## ARTICLE XI
## JOINTLY TRUSTEED FUNDS

Section 1.

In addition to the wages and other payments herein provided for, the Employer agrees to pay specified contributions to the following designated funds. In the event any of the trust funds to which contributions are required to be made, under this Agreement, is merged with or into another trust fund, the contributions shall be made to the successor fund.

A.  **Bricklayers and Trowel Trades International Pension Fund**
   1.  The contribution to the Bricklayers and Trowel Trades International Pension fund (IPF) shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

16

NJ  0297

   2.     The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

**B.**   **Local Pension Fund**
   1.     The contribution to the Local Pension Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

   2.     The payments required above shall be made to the territorial Local Pension Fund which was established under an Agreement and Declaration of Trust. All Local Pension Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Pension Fund. The Home Local Funds shall credit any excess monies remitted for the Pension Fund to the employee's Annuity Fund.

**C.**   **Local Annuity Fund**
   1.     The contribution to the Local Annuity Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

   2.     The payments required above shall be made to the territorial Local Annuity Fund which was established under an Agreement and Declaration of Trust. All Local Annuity Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Annuity Fund. The Home Local Funds shall apply any excess monies remitted for the Annuity Fund to the employee's Pension Fund.

**D.**   **Bricklayers and Allied Craftworkers Statewide Welfare Fund**
   1.     The contribution to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

   2.     The payments required above shall be made to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund which was established under an Agreement and Declaration of Trust, dated May 1, 1988.

**E.**   **Industry Advancement Fund**
The parties hereto do hereby establish an Industry Advancement Fund pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and

NJ 0297

any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors. The purpose of the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1.  The Employer shall make contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby as listed on Schedule B attached hereto.

2.  The Bricklayers & Allied Craftworkers' Health & Welfare Fund Office shall collect and distribute such funds.

3.  Effective November 1, 2002, the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey agree to allocate $.02 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.) Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

    BCANJ:                                          50%
    Masonry Contractors of New Jersey:              50%

    In such case as the parties opt to discontinue the $.02 allocation to I.C.E., said $.02 contribution shall be distributed equally between the BCANJ and the Masonry Contractors of New Jersey.

4.  The BCANJ and the Masonry Contractors of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development,

18

NJ 0297

standardization of contracts and specifications and all other such appropriate activities.

5.  Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

6.  The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' Health and Welfare fund 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Health & Welfare Fund shall not be responsible for collection of any delinquent amounts owed by any employer.

F.  **International Masonry Institute (IMI)**

1.  The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2.  In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions from the total hourly wage and benefits package, as listed on Schedule "B" attached hereto.

3.  With IMI funding from New Jersey, IMI will be able to provide advertising and promotion, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area. With these principles in mind, the parties agree to contribute the amounts listed on Schedule "B"

    The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1981, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust, 22 July 1970) and/or to the predecessor International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust, 6 November 1974).

G.  **New Jersey State Apprentice Fund**

1.  The contribution to the New Jersey State Apprentice Fund shall be listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee

19

NJ 0297

receives pay. The Apprentice Fund contribution of $.15 shall be suspended for Local No. 2 and deferred to the Defense Fund established by the Union.

2.    The payments required above shall be made to established New Jersey State Fund office which was established under an Agreement and Declaration of Trust.

**Section 2.**
In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BAC PAC and Defense Funds shall be contributed to as of November 1, 1999. During the term of this agreement, the parties agree to establish uniform wages and fringe benefits for Local No. 4 & 5.

**Section 3.**
The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trust, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

**Section 4.**
The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**Section 5.**
For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

**Section 6.**
Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, apprentices, helpers, trainees and probationary employees.

**Section 7.**
All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

NJ 0297

**Section 8.**
If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for each day the delinquency continues, not to exceed five days. The Employer's liability for payment under this article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

**Section 9.**
Management's appointments to the aforementioned Jointly Trusteed Funds are to be made equally by the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey. The Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey shall only have the right to the appointment of trustees if and when the existing Trust Funds of the predecessor local unions of the International Union of Bricklayers and Allied Craftworkers, Local Unions No. 4 and 5 are merged into statewide benefits funds. Neither the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey shall have the right or authority to appoint trustees to any trust fund of a predecessor local union unless and until a statewide merger of the Trust Funds occur, except if trustees are currently appointed by either the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey, that authority shall remain.

**Section 10.**
The Labor/Management Fund established under an Agreement and Declaration of Trust, shall be used to enhance the economic development and competitiveness of the unionized masonry industry, to assure the effective enforcement of prevailing wage laws and to provide for stable labor-management relations. The parties to this agreement shall appoint trustees to this fund in the same manner in which appointments are made to the Statewide Welfare Fund.

**Section 11.**
The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.

## ARTICLE XII
### HOURS WORK, OVERTIME, SHIFTS, AND HOLIDAYS

A.     The standard work day shall consist of eight (8) hours of work with starting and quitting times of either 7:00 a.m. to 3:30 p.m., or 8:00 a.m. to 4:30 p.m., unless otherwise mutually agreed to by the parties, with a 30-minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on

NJ 0297

Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

B.  All time worked before and after the established eight (8) hour day, Monday through Friday, and all time worked on Saturday shall be paid at the rate of time and one-half. All hours worked on Sundays and holidays shall be paid at the double time rate. If a craftworker works through any portion of their lunch they shall be paid one hour.

If any of the following trades: Carpenters, Laborers, Ironworkers or Operating Engineers Locals, with whom the BCANJ negotiates, receive a more beneficial overtime rate, the Bricklayers will be paid the higher overtime rate.

C.  A make-up day may be worked on Saturday providing it is mutually agreed to by the union and the employer and provided that the following conditions are satisfied:

1.  A make-up day on Saturday can be utilized provided 24 or more hours are worked during the course of the calendar work week, Monday through Friday.

2.  It is not mandatory for an employee to work on a make-up day and it is at their choice and discretion. No negative actions or retribution shall be taken by the employer against any employee who chooses not to work a make-up day.

3.  The sole reason for the loss of hours during the calendar work week must be weather conditions to qualify for a make-up day.

4.  Any time worked before the established starting time or after the established quitting time on a make-up day shall be paid at the applicable overtime rate. Any hours worked on a Saturday make-up day that exceed 40 hours shall be paid at the applicable overtime rate.

5.  If employees are unable to work a make-up day, the local union shall be given the preference to supply the remainder of the employees needed for that day.

6.  There shall be no addition to the previously established crew size for the make-up day.

Any employer who violates the above provisions shall be prohibited from utilizing the make-up day for the duration of this Collective Bargaining Agreement. The employer has the right to file an appeal with the Joint Arbitration Board defined in Article XV of this Collective Bargaining Agreement. Said appeal shall be heard within five (5) days from the date filed. During the appeal process the employer shall be prohibited from utilizing the make-up day provision.

D.  The parties to this Agreement recognize the desirability and in some cases absolute necessity

22

of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule.   If shift work is necessary and it is mutually agreed to by the union and the employer, the following schedule shall prevail:

When a two shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis.  The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail.  The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis.  The first shift shall receive the base or regular hourly rate.  The second shift shall receive the base hourly rate plus 15%.  The third shift shall receive the base hourly rate plus 20%.

When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail.  The second shift shall be established on an eight (8) hour basis.  The third shift shall be established on an eight (8) hour basis.  The second shift shall receive the base hourly rate plus 15%.  The third shift shall receive the base hourly rate plus 20%.

The percentage premium, when added to the base rate, shall be termed the regular hourly rate.  Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period.  When an irregular shift must be established, the percentage premium shall be 15% above the base rate.

All time worked before and after a regularly established shift shall be paid at the applicable overtime rate.  When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

E.    The Employer agrees to recognize the following holidays: New Year's Day, President's Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day.  Holidays falling on a Sunday shall be observed the following Monday.  The above holidays are subject to renegotiation based upon agreements established with other trades.

## ARTICLE XIII
## PAYMENT OF WAGES & FRINGE BENEFITS

All employees working under this Agreement shall be paid in cash or by check weekly on Thursday, or another day if mutually agreed between the business agent and the employer, before quitting time and within 72 hours after the closing of the pay for the week.  When employees are unable to work

23

on pay day due to inclement weather, the employee shall be paid before 12 noon in absence of reasonable cause for delay. An employee who has worked more than three days who is being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff." When working overtime, the one hour notice of layoff does not apply. At the discretion of the Union, out of state contractors may be required to have payroll checks drawn on a local bank. Payroll checks will be delivered to the job site. In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties. Failure to do so will result in immediate withdrawal of all craftworkers from the job. Employees will be compensated by the employer for all lost time until the matter is resolved. If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks. Fringe benefits will be paid on a weekly basis, except that Association Members may pay monthly. Monthly payments shall be due to the fund(s) on or before the fifteenth day of the month immediately following the month during which the contributions were earned. Should an Association Member become delinquent, they may be required by the trustees of the benefits funds to remit weekly payments.

## ARTICLE XIV
## WORKING CONDITIONS

A.  Overhead Protection: If any work is being performed overhead, all Employees must be protected on all outside scaffolds by two inch (2") planks, a covering shall be supplied over all stairwells, hatches, shafts, etc., no more than two (2) stories overhead and two (2) stories below in shafts.

B.  Hard hats are to be supplied by each employer. Failure to wear hard hats is cause for dismissal.

C.  Lines: All contractors must furnish the men with lines. The lines must not be raised more than one (1) course at a time. No bricklayer shall spread mortar before the line has been raised. However, a trig brick can be raised one (1) course before raising the line. Lines on a double unit wall shall be used on both sides of a wall eight inches (8") or over in thickness and on all units of masonry over four (4) feet in length.

D.  Portable Sanitation Units: Suitable portable sanitation units shall be erected on all jobs which shall be kept in sanitary condition. Portable sanitation units shall be built in accordance with State or Municipal health laws.

E.  Cutting Tools: Where employees are employed on cutting masonry, the employer shall have all cutting tools sharpened.

F.  In order to protect the health and safety of employees against the effects of silicosis and other respiratory diseases, the dry cutting of masonry units by the means of hand-held, gas-powered, or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry

24

NJ 0297

materials shall be prohibited on all masonry projects. The only exception to this provision will be when the Union and employer determine that the use of water is not feasible. When the Union and employer identify such tasks, the employer must ensure that the engineering and work practice controls are in place to control the dust: such as a vacuum, with high efficiency particulate air (HEPA) filter or another dust control system. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas.

Respirators should only be used as the primary method of protection if other engineering and work practice controls are not feasible. When the respirators are used, in accordance with the OSHA regulations, employers must provide workers with full-face respirators as part of a complete respiratory program that includes the proper selection of respiratory cartridges, and training and fit-testing to ensure that the worker is able to wear a respirator. It is the employee's responsibility to utilize proper protection.

Additionally, in the event the Union and the employer determine that dry-cutting or grinding is necessary, the contractor agrees to perform periodic air monitoring to ensure that the silica exposure levels do not exceed OSHA permissible exposure limit. Failure to comply will result in work stoppage. The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

Employees engaged in wet cutting masonry products will be furnished elbow length gloves, an apron and goggles. No employee shall operate a wet saw unless provided with a wooden platform on which to stand and the saw is properly grounded.

G.   Cutting and Mechanical Devices: Where air guns or other mechanical devices are used for the purpose of cutting chases, opening, etc., in brick work, such gun or device shall not exceed fifteen (15) lbs. weight. When such device exceeds fifteen (15) lbs., the employer may use a laborer to assist the bricklayer in handling the gun, but there shall always be one bricklayer on each gun in use. All cutting, when done by hammer and chisel, shall be done exclusively by the bricklayer. Where a bull and sledge hammer is used, there shall be a composite crew of bricklayers and laborers. (The bricklayer foreman shall have complete authority over all men employed in this phase of work.) All cutting out of brick work, pointing, washing down, caulking cement and lime waterproofing washing of brick, or slabs, used in floor arches shall be done by bricklayers, and where scaffolding is used in the above work wire rope shall be used.

H.   Pointing: All pointing and joining of brick work shall be done by journeymen who built same, if possible.

25

D N J C 2 9 7

I.     Cement Block: Bricklayers and stone masons to set all cement blocks and all masonry units.

J.     Cork Block: All cork block (Styrofoam Sheets), and substitutes thereof, shall be laid by bricklayers.

K.     Caulking: All pointing and caulking of windows with cement or composition to be done by bricklayers, by either gun, trowel or any other method.

L.     Stone Work: All renovation, cleaning, and pointing of stone to be done by this union.

M.     The setting, aligning and erection of all precast slabs and the setting and leveling of all bearing plates for structural steel or machinery shall be done by the members of the above local union.

N.     Composite crew on all precast panels. Setting of all other masonry panels shall be the work of BAC Members.

O.     All brick or block panels shall be erected by union bricklayers.

P.     Waterproofing: All transparent waterproofing applied to brick or stone work with brush or spray to be done by bricklayers.

Q.     There are to be two men on all blocks weighing 40 lbs. or more.

R.     Scaffolding: No block 6" or over in size shall be built more than six (6) courses in scaffold height. Where blocks of 100 lbs. or over are used, a pony scaffold is to be erected when the wall is three (3) feet high, for the easier laying of these blocks to the next scaffold height. When a BAC member works on a swing scaffold as part of a composite crew, they shall receive the same premium differential as the other trades performing work on the same swing scaffold.

S.     Water: Water containers and sanitary drinking cups shall be provided on all jobs to be furnished by all contractors at all times.

T.     Shanty and Stoves: Where there are not more than ten (10) men employed on a job, a shanty house shall be erected exclusively for the bricklayer, and it shall contain not less than eighty (80) square feet of floor space. Where there are more than ten (10) men and not more than twenty (20) men, the shanty house shall contain not less than one hundred and fifty (150) square feet of floor space. Where there are more than twenty (20) men and not more than thirty (30) men it shall contain not less than two hundred (200) square feet of floor space but where there are more than thirty (30) men employed the same proportion shall apply. Where there is a shanty and no elevator located in the building it shall not be above the ground floor unless elevator is provided except on alterations where it will be placed to suit the convenience of the contractor.

U.   Ample provision shall be made to protect all bricklayers levels on all outside scaffolds.

V.   It shall be deemed unsafe to run any brick work up more than 6 courses or 16" whichever is less without backing up in cavity walls or any masonry walls which does not utilize a brick header course.

W.   Contractors shall provide a two foot clear, planked working area beyond the building wall when bricklayers or stone masons are working off new footing on or below grade.

X.   There shall be a clothing allowance of fifty cents (.50) per hour minimum on all fire brick work paid by contractor.

Y.   There will be one coffee break in the morning not to exceed ten (10) minutes.

Z.   The employee shall be allowed five (5) minutes to clean up prior to quitting time.

AA.   All mortar tubs will be raised to at least sixteen inches, not to exceed thirty inches.

BB.   All rubber gloves and goggles to be furnished by the contractor for all washing down.

CC.   All work on high stacks, the contractor will pay a premium wage of 22% above the wage scale.

DD.   All scaffolds will be kept at least four (4) inches below the wall.

EE.   If an employee works past the full hour and must stop because of inclement weather conditions, he shall be paid for the full hour, but is not to leave the job until expiration of said hour.  No employee shall start work on the half hour.

FF.   If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

GG.   In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between starting time and 12 noon, men shall be paid until noon. Employees must, however, remain on the job until noon.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between 12:30 p.m. and 3:30 or 4:30 p.m., employees shall be paid until 3:30 or 4:30 p.m.  Employees must remain on the job until 3:30 or 4:30 p.m.

HH.   When a job does not start at the regular starting time, it will be the duty of the Foreman to notify the Shop Steward, personally, two hours after the designated start regarding the work conditions.  It is clearly understood and agreed the employer will not send anyone to work

27

NJ 0297

on a job working during inclement weather unless all of the men regularly employed on that job who showed up for work at starting time are started first. Nothing herein contained shall be construed to deny the saw men, lay-out men and steward regularly employed on the job from working at anytime at their respective job assignments if they are needed.

II.   When masons work overtime at the direction of the employer or foreman, they shall receive at least one hour's pay at the applicable overtime rate. Fractions of an hour to be considered a full hour.

JJ.   Employees who may be required to work overtime beyond 6:00 p.m. shall be permitted to take an unpaid one-half hour meal period on the job between 6:00 p.m. and 7:00 p.m. The employer may split a crew for the dinner period.

## ARTICLE XV
## GRIEVANCE PROCEDURE

A.   The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives of the Building Contractors Association of New Jersey, two representatives of the Mason Contractors of New Jersey and four representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement. The boards shall meet at least once a month, or on call, to settle complaints, abuses or grievances. It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board. The Employer and union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

B.   It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C.   Grievances shall be handled in the following manner:

1.   The grievance shall be referred to the jobsite union steward and to an employer representative for adjustment.

2.   If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

28

3.  If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

4.  If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working day, not including weekends and holidays, following a referral of the grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Arbitration Board cannot agree on an impartial arbitrator, then the matter shall be submitted to the American Arbitration Association for a decision. All expenses of the Impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D.  When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

E.  The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance , or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

## JURISDICTIONAL DISPUTES

A.  In order to avoid jurisdictional disputes which have such a demoralizing effect upon the progress of the construction work, it is agreed that only B.A.C. Members will be employed on work which is recognized as coming under the jurisdiction of the International Union of Bricklayers and Allied Craftworkers as:

1.  Granted by the A.F.L. - C.I.O.

2.  Determined by a Joint Board consisting of four representatives from the Local Unions, two representatives from the Building Contractors Association of New Jersey and two representatives from the Mason Contractors of New Jersey.

3.  As established by practice of Employers within the area designated herein whenever (1) or (2) above are not applicable;

29

4.  It is the intent of the parties that wherever a job decision shall be deemed to be strongly indicative of the area practice, the Bricklayers & Allied Craftworkers Local Unions will advise all personnel affected to make future assignments accordingly.

5.  It is further the intent of the parties hereto that wherever possible, and whenever the contractor can reasonably foresee a jurisdictional dispute, the contractor will call a pre-job conference with the Local concerned and the contractors agree that when no agreement is reached, at the request of the Union, the contractor will join in the submission of the matter to the Joint Board. In the meantime, the work shall proceed by the craft in possession of the work.

B.  The Employer and the Unions agree to be governed by the terms and conditions of the Agreement, effective May 1, 1995, as amended, creating the Joint Board for the settlement of any jurisdictional dispute; and the decisions of the Joint Board will be followed in good faith.

## ARTICLE XVI
## SUBCONTRACTING

A.  The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

B.  All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

## ARTICLE XVII
## PRESERVATION OF WORK (Anti-Double Breasting)

A.  In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

30

B.    All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XV is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C.    If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XVIII
## NO-STRIKE/NO-LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIV have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

## ARTICLE XIX
## SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto. If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement,

incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XX
## MORE FAVORABLE CONDITIONS

The Union hereby agrees that if it affords any conditions of a more favorable means to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder.

## ARTICLE XXI
## GENERAL UNDERSTANDING

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged.  It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the Union respecting any questions or misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinated to this Agreement.

Inasmuch as (1) the Union has requested recognition as the majority, Section 9(a), representative of the employees in the bargaining unit described herein and (2) has submitted or offered to show proof of its majority support by those Employees, and (3) the Employer is satisfied that the Union represents the majority of the bargaining unit Employees, the Employer recognizes the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future job sites within that jurisdiction of the Union.

The employer agrees that if it has not previously done so, at any time during this agreement it will, upon the Union's request for recognition as the Section 9(a) representative of the employees in the bargaining unit described herein, and upon the union's submission of proof of majority support by such employees, voluntarily recognize the union as the exclusive representative as defined in Section 9 (a) of the National Labor Relations Act, of all the employees within the bargaining unit on all present and future jobsites within the jurisdiction of the Union.  When the Union has requested recognition as majority representative, the employers recognition will be based on the union's proof or offer to submit proof.  The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

32

Memorandum of Understanding
Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2

≃ NJ 0297

**IN WITNESS WHEREOF,** we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey and the Bricklayers & Allied Craftworkers, Local Unions No. 4 , 5 & 2 have hereunto set our hands and seals this       day of October, 2002.

*Authorized Management Representatives*

Joseph Natoli, BCANJ

Jack Kocsis, Jr., BCANJ

Michael Schmerbeck, MC of NJ

Michael Peterson, BCA/AC

*Authorized Union Representatives*

Gerald Della Salla, Local No. 4

Michael Perrone, Local No. 5

Thomas F. Rhoades, Local No. 2

33

10-04-06    06:09    From-10BAC

APR 10 2003 11 39AM
Mar-28-03 03:05P BAC Local 5 NJ

The undersigned employer agrees to bu

TRI-STATE MASONRY SYSTEMS INC
289530 0006 NJ 1

agreement:

Tri-State Masonry Systems, Inc.
**Name of Firm**

921B Forth Bethlehem Pike,
**Physical Street Address**

Springhouse, Pennsylvania        19477-0819
**City**                                                State              Zip Code

215-654-1900                        215-654-1804
**Phone Number**                        **Fax Number**

23-2602976
**Employers Federal Identification Number**

232-602-976/000
**New Jersey Employment Compensation Number**

American Zurich Insurance
**Workmen's Compensation Insurance Carrier**

04/10/2003
**Date**

### SIGNATURE OF PARTIES

_Ann A. Agresta_                Saverio A. Agresta        Vice-President
**Member of Firm Signature**        **Printed Name**            **Title**

_Michael R Perraxe_            Michael R Perraxe        Bus Mgr  3/4/03
**Union Officer Signature**        **Printed Name**            **Title**

**Field Representative Signature**        **Printed Name**

### PLEASE COMPLETE AND REMIT TO:

Bricklayers & Allied Craftworkers Local No 5
3251 Route 206, Suite 3
Bordentown, New Jersey 08505
(609) 324-0500
Fax (609) 324-1505

_EFFECTIVE NOVEMBER 1, 2002 THROUGH OCTOBER 31, 2007_

BNJ 0297

# MEMORANDUM OF UNDERSTANDING

It is hereby agreed by and between the Building Contractors Association of New Jersey, Masonry Contractors of New Jersey and all affiliated local associations and the International Union of Bricklayers and Allied Craftworkers Locals No. 4, 5 & 2 that the local union's collective bargaining agreement between said parties, which expires on October 31, 2002, shall hereby continue in full force and effect except as modified herein:

**I.    Terms of Agreement**

A.    There shall be a total wage/fringe package increase of:
-$2.00 effective November 1, 2002;
$2.00 effective November 1, 2003;
$2.00 effective November 1, 2004;
$2.00 effective November 1, 2005;
$2.00 effective effective November 1, 2006.

B.    In addition, there shall be a $.03 per hour increase to the IAP effective November 1, 2002. There will be no further increases to the IAP for the duration of this contract unless mutually agreed to by the parties.

C.    The parties agree that there shall be parity in the total wage/fringe package between Locals No. 4, 5 & 2, to be accomplished during the duration of this agreement. Therefore, in addition to the increases established in Paragraph A, the following additional increases shall be effective as follows:

For Local No. 5 & 2 the following **additional** total wage/fringe increases shall apply:

| | |
|---|---|
| Effective November 1, 2003 - | $.30 per hour |
| Effective November 1, 2004 - | $.30 per hour |
| Effective November 1, 2005 - | $.30 per hour |
| Effective November 1, 2006 - | $.32 per hour |

For Local No. 2 (covering the Camden, Salem and Gloucester counties area) the following **additional** total wage/fringe increase shall apply:

| | |
|---|---|
| Effective November 1, 2002 - | $.50 per hour |
| Effective November 1, 2003 - | $.50 per hour |
| Effective November 1, 2004 - | $.50 per hour |
| Effective November 1, 2005 - | $.50 per hour |
| Effective November 1, 2006 - | $.50 per hour |

D.    The Agreement shall expire on October 31, 2007.

Page 1 of 6

RECEIVED
NOV 1 3 2002
COLLECTIVE BARGAINING SERVICES

PNJ 0297

Memorandum of Understanding
Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2

II.     The Agreement shall be modified, by mutual agreement, so that language that is incorrectly
        placed is moved to appropriate articles and sections including, but not limited to, the
        following:
        A.      Article III: Cement Masons/Paragraphs K and M shall be moved to Article
                XIV/Working Conditions.

III.    **Article III: Scope of Work**
        Scope of work shall be amended to reflect the following:

        A.      Bricklayers, Cement Masons, Plasterers, Pointer Caulkers, Cleaners, Fire Proofers,
                Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade
                jurisdiction for Bergen, Essex, Hudson, Morris, Passaic, Sussex, Union, Warren, part
                of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional
                map maintained by the International Union.

        B.      Bricklayers, Pointer Caulkers, Cleaners, Stone Masons, Brick Pavers and Exterior
                Marble Masons shall be the trade jurisdiction for, Atlantic, Burlington, Camden,
                Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts
                of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional
                map maintained by the International Union.

        C.      The trade and territorial jurisdiction for Local No. 2 shall cover new construction,
                maintenance, repair and renovation in the New Jersey counties of Atlantic,
                Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth,
                Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset for all work falling
                within the jurisdiction of the Union, as defined in Branches of the Trades for Cement
                Masons, Plasterers & Fire Proofers, Code 1 of the Constitution, Rules of Order and
                Codes of the International Union of Bricklayers and Allied Craftworkers.

        D.      Autoclaved Aerated Concrete Masonry Units (AACMU)
                The Bricklayer shall perform the complete installation and related finish work of all
                AACMU. These operations include, but are not limited to; the cutting, fitting and
                applications of mortar and/or other cementious materials used for the setting and
                bonding purposes as well as the actual laying of the AACMU block units into
                position. The routing, drilling, cutting and patching for all mechanical piping and
                openings. The preparation, assembly, unloading, selecting or staging of AACMU
                panels, hooking on, signaling, drilling, cutting, installation of support angles or strut
                supports, fitting, bedding, landing, setting, leveling, plumbing, aligning, fastening,
                anchoring (whether by bolt, clip, pin, or weld), insulation, caulking, grouting,
                patching, cleaning, waterproofing and installation of all AACMU units. This also
                includes all work operations related to the installation and applications of all coating,


RECEIVED
NOV 1 3 2002
COLLECTIVE BARGAINING SERVICES

ᴄNⱼ  0297

Memorandum of Understanding
Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2

covering and veneer systems (both exterior and interior) on all AACMU units. These work operations include, but are not limited to: preparations of walls, the mixing and applications of any and all finish coating materials by any method (i.e. trowel on, machine, spray on, etc.) or any other device deemed necessary to produce the desired finish surface.

E.   Cement Masons Agreement (Paragraph N)
Employees who have been employed on a job more than three (3) days who are discharged or laid off shall be notified and paid off one hour before such discharge or layoff. If not complied with, another hour shall be paid. The one hour notice of layoff does not apply when overtime is worked.

IV.   **Article IV: Union Recognition, Union Security, Access**
This article shall be amended to include the following language:
"It is recognized and agreed by the parties to this Collective Bargaining Agreement that the Local Union is the authorized collective bargaining agent for all its members in connection with issues related to the wages, working conditions, employee fringe benefit funds and reciprocity."

V.   **Article XI: Jointly Trusteed Funds**
Add...
"In the event any of the trust funds to which contributions are required to be made, under this Agreement, is merged with or into another trust fund, the contributions shall be made to the successor fund."

"For Local No. 2, the Apprentice Fund contribution of $.15 shall be suspended and replaced with a $.15 contribution to a Defense Fund to be established by the Union."

Amend Section 2 as follows:
"During the term of this agreement, the parties agree to establish uniform wages and fringe benefits for Local No. 4 & 5."

VI.   **Article XII:  Hours of Work**
Amend Paragraph A as follows:
"Work Hours shall be modified so that the standard work day shall consist of eight hours of work with starting and quitting times of either 7:00 a.m. to 3:30 p.m., or 8:00 a.m. to 4:30 p.m., unless otherwise mutually agreed to by the parties."



RECEIVED
NOV 1 3 2002
COLLECTIVE BARGAINING SERVICES

Memorandum of Understanding
Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2

NJ  0297

**VII.  Article XIII: Payment of Wages & Fringe Benefits**
Amend article to include the following:
"An employee who has worked more than three days who is being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff."

Add...
"When payment by check is permitted, the union may require that provisions be made to cash checks locally for out of state contractors. The Employees shall be paid prior to the end of the established weekly pay day, at the jobsite, or an earlier day if the regular pay day falls on a recognized holiday when the banks are closed."

**VIII.  Article XIV: Working Conditions**
Paragraph (F) shall be amended as follows:
"In order to protect the health and safety of employees against the effects of silicosis and other respiratory diseases, the dry cutting of masonry units by the means of hand-held, gas-powered, or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be prohibited on all masonry projects. The only exception to this provision will be when the Union and employer determine that the use of water is not feasible. When the Union and employer identify such tasks, the employer must ensure that the engineering and work practice controls are in place to control the dust: such as a vacuum, with high efficiency particulate air (HEPA) filter or another dust control system. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas

Respirators should only be used as the <u>primary</u> method of protection if other engineering and work practice controls are not feasible. When the respirators are used, in accordance with the OSHA regulations, employers must provide workers with full-face respirators as part of a complete respiratory program that includes the proper selection of respiratory cartridges, and training and fit-testing to ensure that the worker is able to wear a respirator. It is the employee's responsibility to utilize proper protection.

Additionally, in the event the Union and the employer determine that dry-cutting or grinding is necessary, the contractor agrees to perform periodic air monitoring to ensure that the silica exposure levels do not exceed OSHA permissible exposure limit. Failure to comply will result in work stoppage. The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

Page 4 of 6

☑NJ  0297

Employees engaged in wet cutting masonry products will be furnished elbow length gloves, an apron and goggles.  No employee shall operate a wet saw unless provided with a wooden platform on which to stand and the saw is properly grounded."

Paragraph (R) shall include the following:
"When a BAC member works on a swing scaffold as part of a composite crew, they shall receive the same premium differential as the other trades performing work on the same swing scaffold.

Paragraph (Y) shall be changed to:
Delete...       The afternoon coffee break.
Add...          The employee shall be allowed five (5) minutes to clean up prior to quitting time.

**IX.    Article XXI: General Understanding**
This article shall be amended to include the following:
Add...
"Inasmuch as (1) the Union has requested recognition as the majority, Section 9(a), representative of the employees in the bargaining unit described herein and (2) has submitted or offered to show proof of its majority support by those Employees, and (3) the Employer is satisfied that the Union represents the majority of the bargaining unit Employees, the Employer recognizes the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future job sites within that jurisdiction of the Union.

The employer agrees that if it has not previously done so, at any time during this agreement it will, upon the Union's request for recognition as the Section 9(a) representative of the employees in the bargaining unit described herein, and upon the union's submission of proof of majority support by such employees, voluntarily recognize the union as the exclusive representative as defined in Section 9 (a) of the National Labor Relations Act, of all the employees within the bargaining unit on all present and future jobsites within the jurisdiction of the Union.  When the Union has requested recognition as majority representative, the employers recognition will be based on the union's proof or offer to submit proof.  The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board."

Delete...
    Third Paragraph

N. 0297

Memorandum of Understanding
Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2

**IN WITNESS WHEREOF,** we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey and the Bricklayers & Allied Craftworkers, Local Unions No. 4 , 5 & 2  have hereunto set our hands and seals this        day of October, 2002.

*Authorized Management Representatives*

Joseph Natoli, BCANJ

Jack Kocsis, Jr., BCANJ

Michael Schmerbeck, MC of NJ

Michael Peterson, BCA/AC

*Authorized Union Representatives*

Gerald Della Salla, Local No. 4

Michael Perrone, Local No. 5

Thomas F. Rhoades, Local No.2

Page 6 of 6

# NEW JERSEY B.A.C. LOCAL #4 - NORTH JERSEY
## WAGE RATE AND FRINGE PACKAGE AS OF NOVEMBER 1, 2002

## WAGES

| | |
|---|---|
| JOURNEYMAN | $31.22/HOUR |
| FOREMAN | 36.91/HOUR |
| DEPUTY FOREMAN | 35.91/HOUR |

NJ 0297

**All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One Half.**
**Any time worked thru Lunch shall be paid One (1) hour.**
**All hours worked on Sundays & Holidays shall be paid at Double time rate**

### FRINGE BENEFIT PACKAGE

NOTE: CHECKS FOR THESE BENEFITS PAYABLE
To: B.A.C. LOCAL #4 BENEFIT FUNDS
$14.86 X HOURS PAID

| | |
|---|---|
| HEALTH FUND | $ 5.00 |
| LOCAL PENSION FUND | 3.30 |
| INT'L PENSION FUND | 1.50 |
| ANNUITY FUND | 3.75 |
| N.J. APPRENTICE FUND | .15 |
| INDUSTRY ADVANCEMENT FUND | .33 |
| INT'L MASONRY INSTITUTE | .70 |
| LABOR MANAGEMENT FUND | .05 |
| **TOTAL FRINGE** | **$14.78** |

### DEDUCTIBLE ITEMS TO BE INCLUDED IN BENEFIT PAYMENT

| | |
|---|---|
| I.U. PAC | $ .01 |
| LOCAL #4 PAC | .07 |
| TOTAL DEDUCTIBLE ITEMS | $ .08 |

LOCAL #4 DUES CHECK OFF IS TO BE DEDUCTED FROM WAGES AFTER TAXES AND PAID WITH A SEPARATE
CHECK PAYABLE TO B.A.C. LOCAL #4 N.J.

| | | |
|---|---|---|
| JOURNEYMAN | $1.94 | PER HOUR PAID |
| FOREMAN | $2.16 | PER HOUR PAID |
| DEPUTY | $2.12 | PER HOUR PAID |

RECEIVED
NOV 1 3 2002
COLLECTIVE BARGAINING SERVICES

**IMPORTANT:** BOTH FRINGE AND CHECK-OFF PAYMENTS ARE TO BE SENT
TO:  N.J. B.A.C. LOCAL #4 BENEFIT FUNDS
143 WASHINGTON STREET
MORRISTOWN, N.J. 07960

# NEW JERSEY B.A.C. LOCAL #4 - NORTH JERSEY

## APPRENTICE WAGE AND FRINGE PACKAGE AS OF NOVEMBER 1, 2002

|  | 50% | 55% | 65% | 75% | 85% | 95% |
|---|---|---|---|---|---|---|
| W A G E S | 15.61 | 17.17 | 20.29 | 23.41 | 26.53 | 29.65 |
| HEALTH FUND | 2.50 | 2.75 | 3.25 | 3.75 | 4.25 | 4.75 |
| LOCAL PENSION FUND | 0 | 0 | 2.14 | 2.47 | 2.80 | 3.13 |
| I.U. PENSION FUND | 0 | 0 | .98 | 1.13 | 1.28 | 1.43 |
| ANNUITY FUND | 0 | 0 | 2.44 | 2.81 | 3.19 | 3.56 |
| NJ APPRENTICE FUND | 0 | 0 | .15 | .15 | .15 | .15 |
| I A P | 0 | 0 | .33 | .33 | .33 | .33 |
| I M I | 0 | 0 | .70 | .70 | .70 | .70 |
| LABOR MGT FUND | 0 | 0 | .05 | .05 | .05 | .05 |
| IN'L BAC PAC FUND *DEDUCTION* | .01 | .01 | .01 | .01 | .01 | .01 |
| BAC PAC *DEDUCTION* | .07 | .07 | .07 | .07 | .07 | .07 |
| TOTAL FRINGE | 2.58 | 2.83 | 10.12 | 11.47 | 12.83 | 14.18 |
| DUES-CHECK OFF *DEDUCTION* | .82 | .89 | 1.31 | 1.49 | 1.67 | 1.85 |

RECEIVED
NOV 13 2002
COLLECTIVE BARGAINING SERVICES

# NEW JERSEY B.A.C. LOCAL #4 - NORTH JERSEY
### WAGE RATE AND FRINGE PACKAGE AS OF JANUARY 1, 2003

BNJ 0297

*Ap. 12/6/02*

## WAGES

| | |
|---|---|
| JOURNEYMAN | $30.37/HOUR |
| FOREMAN | 36.06/HOUR |
| DEPUTY FOREMAN | 35.06/HOUR |

**All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One Half.**
**Any time worked thru Lunch shall be paid One (1) hour.**
**All hours worked on Sundays & Holidays shall be paid at Double time rate**

**FRINGE BENEFIT PACKAGE**                NOTE: CHECKS FOR THESE BENEFITS PAYABLE
                                         To: **B.A.C. LOCAL #4 BENEFIT FUNDS**
                                         **$15.75 X HOURS PAID**

| | |
|---|---|
| HEALTH FUND | $ 5.25 |
| LOCAL PENSION FUND | 3.65 |
| INT'L PENSION FUND | 1.50 |
| ANNUITY FUND | 4.00 |
| N.J. APPRENTICE FUND | .15 |
| INDUSTRY ADVANCEMENT FUND | .33 |
| INT'L MASONRY INSTITUTE | .70 |
| LABOR MANAGEMENT FUND | .05 |
| **TOTAL FRINGE** | **$15.63** |

**DEDUCTIBLE ITEMS TO BE INCLUDED IN BENEFIT PAYMENT**

| | |
|---|---|
| I.U. PAC | $ .02 |
| LOCAL #4 PAC | .10 |
| **TOTAL DEDUCTIBLE ITEMS** | **$ .12** |

LOCAL #4 DUES CHECK OFF IS TO BE DEDUCTED FROM WAGES AFTER TAXES AND PAID WITH A SEPARATE
CHECK PAYABLE TO **B.A.C. LOCAL #4 N.J.**

| | | |
|---|---|---|
| JOURNEYMAN | $1.94 | PER HOUR PAID |
| FOREMAN | $2.16 | PER HOUR PAID |
| DEPUTY | $2.12 | PER HOUR PAID |



RECEIVED
DEC - 6 2002
COLLECTIVE BARGAINING SERVICES

**IMPORTANT:** BOTH FRINGE AND CHECK-OFF PAYMENTS ARE TO BE SENT
TO: N.J. B.A.C. LOCAL #4 BENEFIT FUNDS
143 WASHINGTON STREET
MORRISTOWN, N.J. 07960

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et al.,               )
                                 )
           Plaintiffs,          )
                                 )
          v.                )     Civil Action No. 06-1949 (TFH)
                                 )
TRI-STATE MASONRY SYSTEMS, INC.,    )
                                 )
           Defendant.         )
                                 )

## JUDGMENT

The Summons and Complaint in this action having been duly served on the above-named Defendant on December 4, 2007, and the time for said Defendant to appear and defend herein having expired, and Defendant not having filed an Answer, and the Clerk having entered default, and the Plaintiffs having filed a declaration of a total amount due of $158,289.20, and Plaintiffs having moved for entry of judgment by default in that amount, it is hereby

ORDERED, ADJUDGED, AND DECREED that the final judgment in favor of Plaintiffs and against Defendant is hereby granted and ordered entered as the judgment in this action as follows:

1.     That Plaintiffs John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H.J. Bramlett, Eugene George, Paul Songer, Charles Velardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent Delazzero and Ben Capp, Jr., all of whom are Trustees of, and sue on behalf of, the Bricklayers & Trowel Trades International Pension Fund ("IPF"), 620 F Street N.W., 9th Floor, Washington, DC 20004, recover from

Defendant, Tri-State Masonry Systems, Inc., 521B Plymouth Road, Plymouth Meeting, PA 19462, the amount due of $158,289.20;

2.     That Tri-State Masonry Systems, Inc. be directed to submit all monthly reports and contributions that may come due the Plaintiffs subsequent to the filing of this judgment;

3.     That Tri-State Masonry Systems, Inc. comply with its obligations to make timely and full contributions to the IPF; and

4.     That said judgment is without prejudice to the right of Plaintiffs to seek recovery of any past or future delinquencies, interest, damages and reasonable attorney's fees and costs that may be owing to the Plaintiffs from Tri-State Masonry Systems, Inc.

ORDERED, ADJUDGED AND DECREED that Plaintiffs have execution therefor.

Dated: _____, 2007        _____

Thomas F. Hogan
United States District Judge

2225347.01

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN FLYNN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 06-1949 (TFH) |
| ) | |
| TRI-STATE MASONRY SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## LOCAL RULE 7(k) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with orders, judgments and stipulations:

Ira R. Mitzner, Esquire
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006

Tri-State Masonry Systems, Inc.
521B Plymouth Road
Plymouth Meeting, PA 19462

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Entry of Default Judgment, with the Declaration of David F. Stupar, Declaration of Ira R. Mitzner, proposed Judgment, and Local Rule 7(k) Statement, was served by first-class mail, postage prepaid, on the 14th day of March 2007 upon:

> Tri-State Masonry Systems, Inc.
> 521B Plymouth Road
> Plymouth Meeting, PA  19462

Joanne Jackson